COMMONWEALTH OF MASSACHUSETTS
DISTRICT COURT OF MASSACHUSETTS

_____
                                            )
CHESTER E. GNOZA and COLE LUPIEN,           )
                         Plaintiffs,        )
                                            )
v.                                          )     Civil Action No. _____
                                            )
GREEN TREE SERVICING, LLC, and              )
JOHN DOE a/k/a "GARY ROSE,"                 )
                         Defendants.        )
                                            )
_____

## COMPLAINT AND REQUEST FOR JURY TRIAL

The plaintiffs Chester E. Gnoza ("Mr. Gnoza") and Cole Lupien ("Mr. Lupien") (collectively the "Plaintiffs"), hereby complain of the defendants Green Tree Servicing, LLC ("Green Tree") and John Doe a/k/a "Gary Rose" ("Mr. Rose") (collectively the "Defendants") as follows:

### PARTIES

1. The Plaintiffs are married to each other and they reside in Winchendon, Massachusetts.

2. The Defendant Green Tree is an LLC formed in Delaware, headquartered in St. Paul, MN, with offices in Tempe, AZ, and licensed as a debt collector (license # DC0656) in Massachusetts with its Resident/Registered Agent being CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

3. The Defendant John Doe a/k/a "Gary Rose" is the individual at Green Tree who at all times acted on behalf of Green Tree to the Plaintiffs. It is presently unknown whether "Gary Rose" is the Defendant John Doe's actual name or whether this name is an alias.

4. At all relevant times the Defendants acted as "debt collector[s]" within the meaning of 15 U.S.C. §1692a (6).

**JURSIDICTION AND VENUE**

5. Plaintiff's federal law claims arise under the Fair Debt Collection Practices Act, 15 U.S.C. §*1692 et. seq.* ("FDCPA"). This Court therefore has subject matter jurisdiction over said claims pursuant to 15 U.S.C. §1692k (d).

6. This court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367 to hear and adjudicate any claims arising under state law.

7. Venue is proper in this district pursuant to 28 U.S.C. §1391(b), in that the Defendants transact business in this District and a substantial portion of the acts giving rise to this action occurred in this District.

**PRELIMINARY STATEMENT**

8. The FDCPA is a comprehensive statute, which prohibits a catalog of activities in connection with the collection of debts by third parties. See 15 U.S.C. §1692 *et. seq.* The FDCPA imposes civil liability on any person or entity that violates its provisions, and establishes general standards of debt collector conduct, defines abuse, and provides for specific consumer rights. 15 U.S.C. §1692k. The operative provisions of the FDCPA declare certain rights to be provided or claimed by debtors, forbid deceitful and misleading practices, prohibit harassing and abusive tactics, and proscribe unfair or unconscionable conduct, both generally and in a specific list of disapproved practices.

9. The FDCPA broadly prohibits unfair or unconscionable collection methods, conduct which harasses, oppresses or abuses any consumer debtor, and any false, deceptive or misleading statements in connection with the collection of a debt.  The substantive heart of the FDCPA lies in three broad prohibitions.  First, a "debt collector may not engage in any conduct the natural consequences of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. §1692d.  Second, a "debt collector may not use any false, deceptive or misleading representation or means in connection with the collection of a debt." 15 U.S.C. §1692e.  And, third, a "debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. §1692f.  The FDCPA is designed to protect consumers from unscrupulous debt collectors, regardless of the existence of a valid debt.

10. In enacting the FDCPA, Congress found that "there is abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors," which "contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." 15 U.S.C. §1692a.  Congress additionally found existing laws and procedures for redressing debt collection injuries to be inadequate to protect consumers." 15 U.S.C. §1692b.

11. In enacting the FDCPA Congress intended to regulate the manner in which debt collectors engaged in the collection of consumer debts.  The express purposes of the FDCPA are to "eliminate abusive debt collection practices by debt collectors, to insure that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C.§1692e.

## FACTS

12. The facts of this case (up to December 6, 2012) are contained in a M.G.L. c. 93A demand letter sent by counsel for the Plaintiffs to Green Tree dated December 6, 2012. A copy of that letter is attached hereto as Exhibit "A" along with the exhibits attached thereto and the aforesaid letter and exhibits are expressly incorporated herein (the "93A Demand Letter"). The exhibits to the 93A Demand Letter are referenced throughout this complaint as "93A Demand Letter, Exhibit __" and are found as the attachments to Exhibit "A" to this complaint.

13. On June 29, 2007 Countrywide Home Loans Inc. ("Countrywide") caused a foreclosure sale to occur on Mr. Gnoza's and Mr. Lupien's home located at 66 Baldwinville Road, Templeton, Massachusetts. The sale allowed for an $185,240.01 payoff of the Countrywide mortgage. See 93A Demand Letter, Exhibit "A," a letter from the closing attorney R. Craig Reynolds dated June 29, 2007, attached hereto.

14. The aforementioned mortgage was discharged. See "Discharge of Mortgage" attached hereto as 93A Demand Letter, Exhibit "B."

15. Countrywide also held a second mortgage on the property but it did not seek a payoff of that mortgage at the June 29th closing. See 93A Demand Letter, Exhibit "C" which is Countrywide's Payoff Demand Statement for the foreclosure sale. Countrywide did not include the second mortgage in Countrywide's Payoff Demand Statement nor did it issue a separate payoff demand statement for the second mortgage.

16. Thereafter, sometime in early to mid-January, 2012 Mr. Rose from Green Tree called Mr. Gnoza at work to collect on the second mortgage from the house sale of over $60,000.00; even though Countrywide had not demanded payment on that loan at the prior foreclosure closing.

17. Mr. Gnoza had Mr. Lupien called Mr. Rose back.  Mr. Lupien told Mr. Rose that Mr. Rose was not to call Mr. Gnoza at work, because calls were not allowed to employees and that he could get fired.  Mr. Rose asked: "How are you guys going to pay for the debt."  There was a discussion of Mr. Lupien selling his house to pay off this debt.   Mr. Rose promised to call Mr. Lupien and not Mr. Gnoza from that point forward.

18. This first conversation lasted about 30 minutes.  Mr. Rose wanted tax returns, pay stubs, 401k statements, bank statements (checking and savings), life insurance policies.

19. Mr. Rose wanted to know why Mr. Lupien was not working.  Mr. Lupien told Mr. Rose that he was working at Chem Design in Fitchburg when on March 20, 1995 welders were cutting a pipe and that touched off an explosion of one of the ovens, leaving Mr. Lupien permanently 100% disabled with Interstitial lung disease, PTSD, depression, anxiety, and other physical and psychological injuries.  Mr. Lupien was in the hospital for 21 days after this life-altering industrial accident.

20. Mr. Rose knew that Mr. Lupien was vulnerable, injured and a perfect target for his harassment.

21. By letter dated January 19, 2012 Mr. Rose sent Mr. Gnoza a "Hardship Processing Procedure" letter.   The letter included an application.  The application was filled in by Mr. Lupien and faxed back to Mr. Rose with copies of almost everything that Mr. Rose requested.  Attached as 93A Demand Letter, Exhibit "D" is a copy of the January 19, 2012 letter with the application as filled out by Mr. Lupien.

22. On or about February 9, 2012 Mr. Lupien listed his house in Winchendon, at 453 Central Street, for sale.

23. On or about February 20, 2012 an offer was accepted for the sale of Mr. Lupien's house. Mr. Lupien called Mr. Rose and told him of the news and Mr. Rose seemed delighted.

24. On or about March 13, 2012, Mr. Rose called the Gnoza/Lupien home in the morning. Mr. Rose was angry and combative. He insisted to Mr. Lupien that Mr. Rose knew that Mr. Lupien had been monitoring his phone calls and that is why Mr. Lupien had not picked up on Mr. Rose's last three calls. Mr. Lupien told Mr. Rose he was wrong, that they picked up the phone when they were home. After this harassment, the two men talked about the sale of the house. Either in this call or other calls Mr. Rose insisted that Mr. Gnoza and Mr. Lupien sell jewelry, furniture and clothing to pay Green Tree. Mr. Rose also wanted tax refunds to pay off the alleged debt.

25. By letter dated March 14, 2012, Green Tree offered to settle the alleged debt of $63,680 for $25,000, with a payment of $5,000 by March 23rd and a payment of $20,000 by April 27th. Attached as 93A Demand Letter, Exhibit "E" is a copy of the March 14, 2012 letter.

26. Then, on or about March 20, 2012, Mr. Rose called the Gnoza/Lupien home at about 6 pm. Mr. Lupien took the call. Mr. Rose questioned whether the men had money from them from the sale of jewelry or from tax refunds. When told there was no money from these sources, Mr. Rose became very upset and raised his voice. He said that the men were not cooperating with him. He said that he was doing his part and that the men weren't doing a damn thing for him. Mr. Rose said the men didn't appreciate him. Mr. Rose said he would never work with anyone else like this again. The conversation lasted around 10 minutes until Mr. Rose hung up. Mr. Rose did not identify him as a debt collector in this or the other calls identified in the letter or throughout this complaint.

27. On March 23rd, which was when the Green Tree offer letter called for a $5,000.00 payment (see 93A Demand Letter, Exhibit "E"), Mr. Rose called the house at 10:36 am. Mr. Lupien was out at the time and Mr. Gnoza was at work so no one picked up.

28. Within minutes of the call to the Gnoza/Lupien home, Mr. Rose called Mr. Gnoza at work despite that he promised to not call him at work because of the stress that it caused and because it could get Mr. Gnoza fired. Mr. Rose made that call (on March 23, 2012) at about 10:50 am.

29. Mr. Rose was looking for money. When he picked up, Mr. Gnoza asked Mr. Rose why Mr. Rose was calling him at work. Mr. Rose said he was calling because he wanted that $5,000.00. Mr. Gnoza said he didn't have the money for him. The house has not closed, and the jewelry and furniture was not worth that. Mr. Rose told Mr. Gnoza to get the $5,000.00 and to "back-date" the check so that the Bank of America (the apparent assignee of Countrywide) didn't know that the men missed the first payment deadline.

30. In the call of March 23, 2012 Mr. Rose threatened Mr. Gnoza and told him he would "take his whole paycheck" (which is illegal) and that the alleged debt would go back up to $63,000+. Mr. Rose chided Mr. Gnoza and insisted that the men were "not working with him."

31. This phone call of March 23rd to Mr. Gnoza at worked lasted approximately 10 minutes. The phone is over to the side of the manufacturing line where Mr. Gnoza works.

32. After the call Mr. Gnoza's face was beet red. He felt that his blood pressure rise and this frightened him as Mr. Gnoza has an aneurysm of an artery of the heart. With this condition the aneurysm could burst due to factors including stress in which case he could or would die within minutes or hours.

33. David Dexter is Mr. Gnoza's boss and the plant manager.  Mr. Dexter noticed how upset Mr. Gnoza was from the call and asked Mr. Gnoza if he was all right. The whole line of roughly 5 people saw the stress that Mr. Gnoza was under as a result of the call with Mr. Rose.  It was frightening, embarrassing, life-threatening, cruel and abusive.

34. On March 26, 2012 Mr. Rose called Mr. Lupien at 2:56 p.m. and was very sarcastic and intimidating.  Mr. Rose said words to the effect as follows:  What's the story now, bub, I'm going to start the paper work rolling with Bank of America.  You guys taught me a good lesson, I'll never go to bat for anyone else again.  Ashamed you did this to a lot of good people.  I'm not going to sit here and listen to you breathe.  I'm going to go ahead and get a hold of Chet now.  I really went out on a limb for you guys.

35. Mr. Rose was told repeatedly not to call Mr. Gnoza at work, but he would not stop.  In fact, when Mr. Gnoza arrived home at 3:30 p.m. on March 26th he had been told there was a call that came in for him but he was already in the parking lot and leaving for the day.   Additionally, Mr. Rose did not identify himself as a debt collector in any of the phone calls that he made to either Mr. Gnoza or to Mr. Lupien.  Every time Mr. Rose called, Mr. Gnoza told him words to the effect that Mr. Rose should not call him at work.  Mr. Gnoza told Mr. Rose that Mr. Rose was jeopardizing his job. Mr. Gnoza said this to Mr. Rose every time Mr. Rose called.  Mr. Rose never responded to this.

36. Mr. Rose's continued his harassment on March 26, 2012.  At 5:50 p.m. on March 26, 2012 Mr. Rose called and spoke to Mr. Gnoza at his home.  Mr. Rose was irate, upset and ultimately hung up after throwing what may be described as a temper tantrum.   During the call Mr. Rose said words to the effect as follows:  I am going to go after your 401K, your entire paycheck and any insurance policies you may have.  You didn't work with me, and it's going to

be 63+ that Bank of America will go after.  Do you have a lawyer?  It's going to cost more money because you didn't work with us.

37. All or almost all of the threats made by Mr. Rose on March 26, 2012 were illegal.

38. At some time during March, 2012 Mr. Lupien contemplated suicide as a direct result of the treatment that he and Mr. Gnoza were facing at the hands of Mr. Rose. Ultimately Mr. Lupien decided to not take his own life because in his view he needed to stay around to care for Mr. Gnoza and to care for their dog.  The decision was intense because the abuse was intense.

39. On April 3, 2012 Mr. Rose called Mr. Gnoza at work around 2:30pm.  As always, Mr. Gnoza asked why Mr. Rose was calling.  Mr. Rose said something about it being the 31st for the check.  Mr. Rose said that he "knew" that Mr. Gnoza got a tax refund and money from the consignment shop.  Mr. Rose said that Mr. Gnoza was "playing games with him, it don't take that long to get money from a consignment shop."  Mr. Rose called Mr. Gnoza a liar.  Mr. Gnoza tried to talk with Mr. Rose but he would not listen.  Mr. Rose said Mr. Gnoza should have lots of money from all the stuff he and Mr. Lupien had sold to pay the bill.  This call lasted around 15 minutes and ended when Mr. Rose hung up after berating Mr. Gnoza for almost the entire call.  Mr. Gnoza was extremely upset and traumatized from this abuse – at work.

40. On April 5, 2012, Mr. Rose called Mr. Lupien.  Mr. Lupien saw the incoming phone identification. Before Mr. Lupien could answer he got so worked up that he became violently ill and vomited all over the kitchen table. Mr. Rose had traumatized Mr. Gnoza and Mr. Lupien to such an extent that even the thought of listening to him would make both men (and either of them) anxious, unsettled, distressed, and frightened.  It took Mr. Lupien about an hour to calm down.

41. On April 11, 2012, Mr. Rose called Mr. Lupien asking when he was going to get his money from the sale of the house. Mr. Rose told Mr. Lupien he didn't put any faith in anything Mr. Lupien or Mr. Gnoza said because it hasn't happened before. He said that "you guys" tend to lie about things when you said you would have the $5,000.00. Mr. Rose said words to the effect that "You really had me fooled, I thought you were men of your word." He asked if there were going to be any hang ups with the sale. Mr. Rose was berating Mr. Lupien and looking for a fight. Mr. Rose was very sarcastic and demeaning in his tone. Mr. Rose ended the call by saying he would check by phone on the 28th if there are no problems.

42. On April 18, 2012, Mr. Rose called in the afternoon and spoke with Mr. Gnoza at home. Mr. Lupien was in on part or all of this call. Mr. Rose may have said that the call was being recorded. Instead of yelling, in this call Mr. Rose remained calm. Mr. Rose wanted to know if "we" were still on for the settlement date (which under the Green Tree offer letter, 93A Demand Letter, Exhibit "E", was April 27, 2012), if everything was still on track with the sale of the house, and if "we" were getting anything for the consignment shops. Mr. Rose was told that the men got $216.95 from the consignment shop where the furniture was. Mr. Rose then wanted to know about the taxes, where those were. Mr. Rose also said that Mr. Lupien said they were getting $2,000.00 from the consignment shop but it was only $216.95 and why was that.

43. In the call reference in Paragraph 42 Mr. Gnoza told Mr. Rose that he and Mr. Lupien were going to be homeless after the 27th. Mr. Gnoza said this two or three times to Mr. Rose but Mr. Rose would not/did not respond to this.

44. When he did speak he said words to the effect that "you had a nice house and nice stuff it should have sold for more." After that Mr. Rose made some generally kind comments but then asked (with words to the effect) "So are we still on or are you going to blow me off again like

last time." Mr. Rose said he would call sometime in the next week to set up a time to do the check by phone.

    45. By letter dated April 20, 2012 the undersigned wrote to Green Tree the following:

> Please be advised that this firm represents the above-named individual **Chester E. Gnoza** regarding claims against your company, and your debt collector who is or calls himself "Mr. Rose," pursuant to the Federal Fair Debt Collection Practices Act, 15 U.S.C. §1692, et. seq. and related state laws of the Commonwealth of Massachusetts. Having been formally notified of representation, we reserve the right to seek injunctive relief should you fail to honor these directives.
>
> **THIS LETTER ALSO SERVES AS NOTICE TO IMMEDIATELY CEASE AND DESIST CONTACTING OUR CLIENT** with respect to the collection or attempted collection of any debt, pursuant to the Federal Fair Debt Collection Practices Act, 15 U.S.C. §1692c(c). There is to be absolutely no calls, letters, or other communications whatsoever by any your company, Mr. Mr. Rose or by any other debt collector or attorney on this account. Do not contact our client at home, at work, by cellular phone, by mail or otherwise.
>
> Additionally, pursuant to 209 CMR 18.18 (3) demand is hereby made for you to provide the undersigned with the following documents (whether they exist in hard copy or electronic media) within five business days of your receipt of this letter: (a) all papers or copies of papers, in your possession which bear the signature of the consumer and which concern the debt being collected, and; (b) a ledger, account card, or similar record in your possession which reflects the date and amount of payments, credits, and charges concerning the debt. These documents are to include all communications, releases and/or discharges of this debt by the original creditor when the home securing the debt was sold with the original creditor's approval allowing for that sale to take place.

    46. Green Tree received the letter referenced in Paragraph 45, above, on April 23, 2012 as evidenced by the USPS return green card. Attached as 93A Demand Letter, Exhibit "F" is a copy of the April 20, 2012 letter from the undersigned and the USPS return green card signed for by Green Tree.

47. Green Tree violated 209 CMR 18.18 (3) by failing to provide any of the documents required by the regulation to be produced.

48. Green Tree called twice on April 25, 2012 (at 10:25 a.m. and at 4:04 p.m.) and once on the morning of April 27, 2012 all in violation of the cease and desist demand contained in the April 20, 2012 letter.

49. By letter dated December 26, 2012 Green Tree sent Mr. Gnoza a dunning letter for the account again in clear violation of the cease and desist demand contained in the April 20, 2012 letter.  A copy of the offending December 26, 2012 Green Tree is attached hereto as Exhibit "B" and is expressly incorporated herein.

### COUNT I – 15 U.S.C. §1692 c(a)(1)

50.  The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

51. The Defendants (through Mr. Rose) communicated with the consumer at unusual times which should have been known to be inconvenient to the consumer and in so doing violated the FDCPA.

52. Mr. Gnoza is entitled to damages as a result of Defendants' violations.

### COUNT II – 15 U.S.C. §1692 c(a)(2)

53.  The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

54. The Defendants communicated with the consumer several times (through Mr. Rose and later in writing) knowing the consumer was represented by an attorney and in so doing violated the FDCPA.

55. One or both of the Plaintiffs are entitled to damages as a result of Defendants' violations.

**COUNT III – 15 U.S.C. §1692 c(a)(3)**

56.  The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

57. The Defendants communicated with the consumer with the consumer at place of employment when it knows that the employer prohibits such communications and in so doing violated the FDCPA.

58. Mr. Gnoza is entitled to damages as a result of Defendants' violations.

**COUNT IV – 15 U.S.C. §1692 d**

59.  The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

60. By the acts complained of above, the Defendants engaged in conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt and in so doing violated the FDCPA.

61. One or both of the Plaintiffs are entitled to damages as a result of Defendants' violations.

**COUNT V – 15 U.S.C. §1692 d(5)**

62.  The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

63. By the acts complained of above, the Defendants caused a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number and in so doing violated the FDCPA.

64. One or both of the Plaintiffs are entitled to damages as a result of Defendants' violations.

### COUNT VI – 15 U.S.C. §1692 e

65.  The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

66. By the acts complained of above, the Defendants used false, deceptive, and/or misleading representation or means in connection with the collection of any debt and in so doing violated the FDCPA.

67. One or both of the Plaintiffs are entitled to damages as a result of Defendants' violations.

### COUNT VII – 15 U.S.C. §1692 e(5)

68.  The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

69. By the acts complained of above, the Defendants threatened to take actions could not legally be taken or that Green Tree did not intend to be take and in so doing violated the FDCPA.

70. One or both of the Plaintiffs are entitled to damages as a result of Defendants' violations.

### COUNT VIII – 15 U.S.C. §1692 e(10)

71.  The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

72. By the acts complained of above, the Defendants used false representations and/or deceptive means to collect or attempt to collect a debt and in so doing violated the FDCPA.

73. One or both of the Plaintiffs are entitled to damages as a result of Defendants' violations.

### COUNT IX – 15 U.S.C. §1692 e(11)

74.  The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

75. By the acts complained of above, the Defendants failed almost universally to identify itself as a debt collector and in so doing violated the FDCPA.

76. One or both of the Plaintiffs are entitled to damages as a result of Defendants' violations.

### COUNT X – 15 U.S.C. §1692 f

77. The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

78. By the acts complained of above, the Defendants used unfair and/or unconscionable means to collect or attempt to collect a debt and in so doing violated the FDCPA.

79. One or both of the Plaintiffs are entitled to damages as a result of Defendants' violations.

### COUNT XI – 940 C.M.R. § 7.04(l)(f)

80. The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

81. By the acts complained of above, the Defendants violated this Massachusetts regulation (constituting and unfair and deceptive trade practice under M.G.L. c. 93A) by engaging in communications in excess of that allowed by law and in so doing violated this consumer protection regulation.

82. Count VI is actionable under M.G.L. c. 93A.

83. One or both of the Plaintiffs are entitled to damages as a result of Defendants' violations.

### COUNT XII – M.G.L. c. 93A, Section 49

84. The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

85. By the acts complained of above, the Defendants attempted to collect debt in an unfair, deceptive or unreasonable manner and in so doing violated this consumer protection statute.

86. One or both of the Plaintiffs are entitled to damages as a result of Defendants' violations.

### **COUNT XIII – Violations of Massachusetts Unfair and Deceptive Trade Practices**

87. The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

88. By letter dated December 6, 2012 the Plaintiffs (through theircounsel) sent the Defendants a demand letter under M.G.L. c. 93A. As stated above, a true and accurate copy of the 93A demand letter is annexed hereto as Exhibits "A" and is expressly incorporated into this count by reference.

89. The Defendants failed and/or refused to make any offer of settlement as provided for under M.G.L. c. 93A §9.

90. As a result of the Defendants' unfair and deceptive trade practices, the Plaintiffs have suffered substantial damages and injury.

91. The Defendants' failure to comply with these provisions constitutes an unfair or deceptive act under M.G.L. c. 93A § 9 and, as such, the Plaintiff is entitled to double or treble damages plus reasonable attorney's fees.

### **COUNT XIV– Negligent Infliction of Emotional Distress**

92. The Plaintiffs repeat and reallege the allegations of paragraphs 1 through 49 herein as if set forth in full.

93. The acts of the Defendant herein constitute a negligent infliction of emotional distress upon the Plaintiffs.

94. The emotional distress inflicted on the Plaintiffs by the Defendants caused physical harm or injury to them as outlined above (and otherwise) manifested by objective symptomatology.

95. The distress alleged was foreseeable, and was distress that a reasonable person would have suffered emotional distress under the circumstances of the case as will be objectively corroborated by the facts stated herein and by other testimony and poof at the trial of this matter.

**WHEREFORE**, the Plaintiffs hereby request that this Court grant judgment in favor of the Plaintiffs and against the Defendants as follows:

a. Inquire into and awards Plaintiff actual compensatory damages suffered pursuant to 15 U.S.C. §1692k(a)(1);

b. Inquire into and award Plaintiffs actual damages suffered by the Plaintiff for her emotional distress;

c. Award Plaintiffs statutory damages of $1,000.00 for violations of 15 U.S.C. §1692k(a)(2)(A);

d. Pursuant to M.G.L. c.93A, Section 49 grant the Plaintiffs damages as allowed by Section 49;

e. Pursuant to M.G.L. c.93A, grant the Plaintiffs up to three times the amount of the actual damages suffered;

f. Award Plaintiffs for the negligent infliction of emotional distress perpetrated upon them by the Defendants;

g. Award Plaintiff all costs of suit, including reasonable attorneys' fees; and

h. Grant such other and further relief as is just and proper.

**THE PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY IN THIS CASE.**

PLAINTIFFS,
By their Counsel,

_____

Richard Kent Berger, Esq.
BBO#548913
Berkent, P.C.
11 Salvi Drive
Framingham, MA 01701
Tel. (508) 969-1041
Email: rkentberger@gmail.com

Dated: February 14, 2012